UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
KENNETH MONZ,

                        Plaintiff,        <u>MEMORANDUM & ORDER</u>
                                          06-CV-5710(JS)(AKT)
        -against-

ROCKY POINT FIRE DISTRICT, ROCKY POINT
FIRE DEPARTMENT, ENGINE CO. #1 of the
Rocky Point Fire Department, ANTHONY
GALLINO, individually and in his
capacity as Chairman of the Board of
the Rocky Point Fire District Board
of Fire Commissioners, WILLIAM LATTMAN,
ALFONSE TIZANO, ANN LOGAN, DAVID BREWER,
Individually and in their official
Capacities as members of the Rocky Point
Fire District Board of Fire Commissioners,

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:    James N. Salvage, Jr., Esq.
                   Scott J. Kreppein, Esq.
                   Reynolds, Caronia, Gianella, Hagney,
                       La Pinta & Quatela, LLP
                   35 Arkay Drive, Suite 200
                   Hauppauge, NY 11788

                   Joseph A. Quatela, Esq.
                   Morganstern & Quatela
                   310 Old Country Road, Suite 104
                   Garden City, NY 11530

For Defendants:    James J. Keefe, Esq.
                   James J. Keefe PC
                   1399 Franklin Avenue, Suite 201
                   Garden City, NY 11530


SEYBERT, District Judge:

        Plaintiff  Kenneth  Monz  ("Plaintiff"  or  "Monz")

commenced this action pursuant to 42 U.S.C. § 1983 on October

23, 2006, against the Rocky Point Fire District (the "District"), the Rocky Point Fire Department (the "Department"), Engine Company #1 of the Rocky Point Fire Department, and the following individuals in their individual and official capacities: Anthony Gallino, William Lattman, Alfonse Tizano, Ann Logan, and David Brewer (collectively, "Defendants"), alleging that they violated his federal and state constitutional rights when they denied him reinstatement as a volunteer fireman.

On December 14, 2009, the Court granted partial summary judgment in favor of Defendants, dismissing all claims against the Department, Engine Company #1, Alfonse Tizano, and Ann Logan. The remaining Defendants--the District, Gallino, Lattman, and Brewer (collectively the "Moving Defendants")-- proceeded to trial on Plaintiff's First Amendment retaliation claim.

A jury trial took place on June 1-2, 2011. The jury found in favor of Plaintiff against each of the Moving Defendants and awarded Plaintiff $350,000 in compensatory damages. Presently before the Court are the Moving Defendants' post-trial motions for (i) judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or (ii) in the alternative, for a new trial, remittitur, or a new trial as to damages under Federal Rule of Civil Procedure 59. For the

following reasons, the Moving Defendants' Rule 50(b) motion is GRANTED and their Rule 59 motions are DENIED AS MOOT.

<u>BACKGROUND</u>

The Court assumes familiarity with the procedural background of this case and, thus, will focus solely on the testimony and other evidence introduced at trial.

I.  <u>Structure of the Department and its Policies</u>

The Department is separated into four companies—each with its own members and elected officers.  (Tr. 82-83, 104, 190.)[1]  Each company elects who among its members will serve as lieutenants and the captain, and the members of the Department as a whole elect who will serve as the chief and deputy chiefs. (Tr. 83-85.)  The officers' duties include overseeing the fire and rescue scenes, managing personnel and membership, and disciplining members.  (Tr. 83.)

The District, on the other hand, has a more administrative role.  (Tr. 83.)  It is run by a Board of Fire Commissioners (the "Board") which is elected by the public at large.  (Tr. 83.)  The Commissioners are in charge of all buildings and grounds in the District and all equipment owned by the District.  (Tr. 83.)  They are also in charge of the District's finances, including approving purchases, formulating

---

[1] "Tr." refers to the trial transcript.

a budget and overseeing the District's paid employees. (Tr. 83.)

All firefighters in the Department serve on a volunteer basis in one of the four companies. They are evaluated annually by the chief based on their level of participation in the Department's activities, including, for example, responding to fires and attending trainings and meetings. (Tr. 50-51, 85.) The Department's more junior members are required to achieve a higher percentage of participation than the Department's more senior members. (Tr. 86.) Firefighters who fail to achieve their required percentage points are considered in "bad standing." (Tr. 46, 50, 86-88.)[2]

Given the volunteer nature of the Department, members often take leaves of absence or temporarily resign for family or other personal issues. (Tr. 33, 176, 223.) The testimony adduced at trial suggests that whether a person is in good or bad standing will impact the resignation process and a volunteer's ability to return to the Department. Monz testified that he has only heard of one person who was ever required to leave in bad standing, and that was because, in addition to being low in percentage points, the individual had a drinking

---

[2] The chief determines who is in bad standing at the end of the calendar year. During the year, the other officers would monitor the members' percentages, determine "who's behind, who has to catch up and try to talk them into picking it up." (Tr. 50.)

4

problem and damaged some District property. (Tr. 46-47.)[3]
Nonetheless, he stated that if an individual did leave in bad
standing and wished to return to the Department, "[he] would
have to file like [he] never belonged." (Tr. 47.) This
requires the approval of the individual company for which he
wants to be a member, the Department as a whole, and the Board.
(Tr. 47.) If an individual resigned in good standing, "the
requirement was only just to hang around the firehouse for a
couple of months and show an interest." (Tr. 32.) Monz
testified that he has "never really seen a problem with anybody
coming back." (Tr. 33.)

Monz's testimony is contradicted somewhat by the
testimony of the Defendants. Brewer testified initially that a
member who resigned in bad standing could never rejoin the
Department, and a member who resigned in good standing would
have to be voted in by his company, the Department, and the
Board. (Tr. 95-97.) In February 2004, the Board changed its
policy regarding reinstatement of members in bad standing,
allowing them to apply for reinstatement after one year. (Tr.

---

[3] There is evidence in the record that other individuals have
been required to resign in bad standing. (See, e.g., Pl. Exs.
5, 9.)

96; Pl. Ex. 6.)[4]  This period has since been extended to three years.  (Tr. 113-14.)

Members may also obtain "honorary status."  This requires a minimum of fifteen years with the Department and good standing.  (Tr. 145.)  Whether an individual is entitled to honorary status is determined by the chief.  (Tr. 88.)

## II.  Monz's Tenure as a Volunteer Firefighter

Monz joined the Department in 1971 and served on-and-off[5] as a member of Company #1 until November 12, 2003.  (Tr. 31; Ex. 4.)  He was an accomplished firefighter, winning a "Heroism and Community Service Award" and a "Medal of Valor" in 2000 for involvement in a water rescue (Pl. Ex. 1), and served Company #1 as an officer--first as a lieutenant and then as captain (Tr. 33-35).

### A.  Alcohol Policy

In 2001, during his tenure as captain of Company #1, Monz lobbied for changes to the Department's alcohol policy.  He testified:  "I didn't like the way things were being done there, drinking at any time, 11:00, 10 o'clock in the morning, guys half crocked, and some of these members were drivers."  (Tr.

---

[4] Lattman and Gallino similarly testified to a one-year waiting period.  (Tr. 147-48, 195-96.)

[5] Twice during his tenure as a volunteer member of the Department, he temporarily resigned and was reinstated.  (Tr. 31.)

39.) So he "sort of pushed on the drinking rules. And leaned on it pretty hard." (Tr. 39.) He testified that he attended meetings with the Department's officers and "actually got loud about it." (Tr. 39.) Shortly thereafter, as a result of his efforts, the Board approved a change in the alcohol policy: the hours during which members could drink were restricted and all alcohol was locked up during non-drinking hours. (Tr. 39.) Monz testified that "[m]ost of the drinkers," including "[b]est friends" Hank Strong and Defendant Lattman, then chief of the Department, were opposed to these changes.[6] (Tr. 39-40, 143.) In fact, Lattman later unsuccessfully lobbied to have the drinking hours extended. (Tr. 140.)

   B.   Campaign Poster Incident

        Monz testified that "after all that drinking thing calmed down and everything," he decided to run for the position of third assistant chief of the Department in the 2002 election. (Tr. 40.) Ann Logan[7] and Lattman were also running in that election: Logan was a Commissioner seeking reelection and Lattman was running against her. (Tr. 40-41, 140.) Both Logan and Lattman hung posters in Company #1. One night during the campaign, Monz caught members of Company #2 on video

---

[6] Lattman testified that although he was opposed to the changes, as chief he repeatedly met with Monz regarding his concerns and they "tr[ied] to work together on it." (Tr. 136.)

[7] Logan supported Monz's revised alcohol policy. (Tr. 140.)

surveillance entering into Company #1's firehouse and drawing a
mustache and beard on Logan's campaign poster. (Tr. 41.) Monz
testified that, at the time, he felt that "these guys ha[d] to
be suspended, this can't happen. You don't come into another
company." (Tr. 42.) So Monz called a meeting, "which officers
are supposed to do," to discuss disciplining the members of
Company #2 who defaced Logan's poster. (Tr. 42.) Lattman, the
chief at the time, was unavailable, so the issue was handled by
Strong, a then-assistant chief. (Tr. 42-43.) Monz testified
that he "demanded" a social suspension--meaning that they could
continue to fight fires, train, and attend meeting, but they
could not socialize in the firehouse.[8] (Tr. 42.) Strong
disagreed, and they "argued back and forth." (Tr. 43.) Monz
told Strong: "[I]f this happened in your firehouse, you would
have suspended them immediately. This is my company, it
happened to my firehouse, this was my property. I take care of
this." (Tr. 43.) Monz testified that Strong told him that he
would "take care of it," but nothing was ever done. (Tr. 43.)

The election occurred shortly thereafter, and Monz
lost. (Tr. 43-44.) He testified that he "got a big smirk
across the room from [Lattman], like the hah-hah you lost."

---

[8] Monz stated that he advocated for what he considered to be a
more lenient suspension because he was running for third
assistant chief and wanted the support of Company #2 in the
election. (Tr. 42.)

(Tr. 44.) According to Monz, after the election, Lattman and Strong refused to speak to him or acknowledge his presence. (Tr. 51.)[9]

C. Monz's Resignation

Following the election in 2002, Monz's family starting having health issues: His wife was sick and needed a full hysterectomy, and his son was diagnosed with multiple sclerosis and went blind. (Tr. 44.) He no longer had time to volunteer, so he sought to take a leave of absence. (Tr. 45.) First, he applied for honorary status on September 18, 2003, which was denied by Strong,[10] the then-chief of the Department, because Monz had less than two percent participation when he was required to maintain at least fifteen percent participation. (Tr. 45; Pl. Ex. 2.) He then, on November 12, 2003, wrote a letter to Steve Tumulty, the captain of Company #2, seeking to resign as a member in good standing. (Pl. Ex. 4.) However, Strong rejected Monz's request and informed the Commissioners that Monz's resignation was as a member in bad standing. (Pl. Exs. 4-5.)

---

[9] Lattman, on the other hand, testified that they never saw each other after the election. (Tr. 143.)

[10] Even though there is evidence to suggest that Monz's application for honorary status was discussed at a Board meeting (Pl. Ex. 3), Monz testified that the Commissioners did not have anything to do with this decision (Tr. 45).

III. Application for Reinstatement

      In 2005, Monz sought to be reinstated. In January 2005, Company #1 voted for reinstatement (Pl. Ex. 7), and in February 2005, the entire Department voted for reinstatement. On February 22, 2005, his application for reinstatement went before the Board. (Pl. Ex. 9.) The Commissioners at this time were Defendants Gallino, Brewer, and Lattman, Ann Logan, and Al Tizzano. Strong again informed the Board that Monz had resigned in bad standing with only 1.9 percent participation. (Pl. Ex. 9.) The Board voted three-to-one against reinstatement. Defendant Brewer testified that he voted against reinstatement "solely based on the fact that the chief of the department advised that the member was in bad standing and his percentage was 1.9 percent, which was far lower than what was required." (Tr. 92.) Defendant Gallino testified that he also voted against reinstatement "based on the evidence that was brought before [him] by the chief of the department," namely, that "Monz had 1.9 percent at the end of the year." (Tr. 191.) Defendant Lattman also voted against reinstatement. He testified as follows:

> [B]etween the board meeting and the
> department meeting, going around because I'm
> a very active member in the department, just
> going around listening to scuttlebutt, to
> people, I heard that Mr. Monz was very upset
> with certain members of the department,
> myself being one, Hank Strong, board of fire

> commissioners, a couple of company one
> members.
>
> When I sat down at that meeting that night,
> the 1.9 percent was presented to me. In the
> back of my mind I had some feelings that
> there was--it was not going to be good for
> morale to allow Mr. Monz back in because of
> what I was hearing. So I kept that to
> myself. I did not put that out on the
> table. That was only my own opinion.
>
> So what was presented to me was the 1.9
> percent and what I was hearing throughout
> the department, which I kept to myself,
> that's how I voted.

(Tr. 138.)[11] Ann Logan voted for reinstatement, and Al Tizzano

abstained. (Pl. Ex. 9.)

During that same meeting the Board voted to reinstate

Charles Freeman, a member with honorary status who had resigned

in bad standing. (Pl. Ex. 9.)

---

[11] Some of Lattman's deposition testimony which was read into the
record evinces a similar motive:

> Monz was going around telling . . . that he
> is going to come back with a vengeance. He
> was coming back with vendetta against Bill
> Lattman and Hank Strong. He was taking down
> the board of fire commissioners, taking them
> down, yadda, yadda, yadda. When it came to
> the vote if I'm not mistaken, commissioner
> brought up percentages, so that had a little
> in my vote, but some of it, most of it was
> because what I was hearing in the department
> and I didn't feel that it would be good for
> the morale of the department.

(Tr. 179.)

I. <u>Defendants' Motion for Judgment as a Matter of Law</u>

    A. <u>Standard of Review</u>

Judgment as a matter of law is proper only when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). "In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" <u>Cross v. N.Y.C. Trans. Auth.</u>, 417 F.3d 241, 247 (2d Cir. 2005) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). A court should set aside a jury verdict "only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." <u>Kosmynka v. Polaris Indus., Inc.</u>, 462 F.3d 74, 79 (2d Cir. 2006) (ellipsis in original) (internal quotation marks and citation omitted).

B.   First Amendment Retaliation

To establish a First Amendment claim for retaliation, Monz must establish, by a preponderance of the evidence, that: "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citation omitted).   The Court previously found, as a matter of law, that (1) Plaintiff's speech--i.e., his speaking out against the Department's alcohol policy and its hard-drinking "frat boy" image--related to a matter of public concern, namely drunkenness among firefighters; and that (2) the Department's decision not to reinstate Plaintiff was an adverse employment action.   (Mem. & Order, Docket Entry 62, at 8.)   The sole issue submitted to the jury was causation. (Tr. 271.)

Before addressing the parties' arguments regarding the sufficiency of the evidence as to causation (which is the sole basis for Defendants' motions), the Court must briefly discuss the portion of the jury charge defining the constitutionally protected speech at issue.

### 1.  Constitutionally Protected Speech

The jury was instructed as follows:  "I instruct you that as it pertains to this case, speech concerning alcoholic consumption by firefighters in the firehouse, and the fire department's frat boy image are matters of public concern, and, hence, protected by the First Amendment."  (Tr. 271.)  At the charge conference, Plaintiff argued that the protected speech at issue "was a little broader than just limiting the drinking hours," and also included "the political climate in general," (Tr. 153) specifically as it relates to Plaintiff's crusade to have the members of Company #2 who defaced Logan's campaign posters disciplined.  The Court questioned Plaintiff's broader definition of the protected speech at issue in this case (Tr. 158) and ultimately decided not to include it in its charge (Tr. 271).  However, Plaintiff relies on evidence surrounding the campaign poster incident in opposition to Defendants' motions (Pl. Opp. ¶ 24), so the Court will briefly explain its rationale for not including it in its charge.

First, Plaintiff raised this broader definition of Monz's protected speech for the first time at trial.  This theory was neither pled (see Compl. ¶ 35 (defining Monz's protected speech as his "campaign to clean up the Department's 'frat-boy' image as a 24-hour all-male drinking club")), nor explicitly included in the Joint Pre-Trial Order (Docket Entry

41, at 2). Further, in denying Defendants' motion for summary judgment with respect to the First Amendment retaliation claim, the Court defined Monz's protected speech as his "speaking out against the Department's purported hard-drinking 'frat boy' image" because it was "unquestionably about a matter of public concern: drunkenness amongst firefighters." (Mem. & Order, Docket Entry 62, at 8.) The parties then failed to revise their Joint Pre-Trial Order, but rather relied upon the Court's summary judgment Order to define the claims and defenses on which they would proceed to trial. (Tr. 154.) Thus, to allow Plaintiff to raise and argue a new theory of recovery at trial would seriously prejudice Defendants who had no opportunity to conduct discovery with respect to this issue or develop a defensive strategy (Tr. 159). See Andrus v. Juniper Grp., Inc, No. 08-CV-1900, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011) (barring Plaintiff from arguing a new theory of liability raised for the first time at trial (collecting cases in support)).

Second, the Court finds that, as a matter of law, Monz's effort to have the Company #2 firefighters disciplined is not protected by the First Amendment. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421,

126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). Here, Monz testified that he was obligated to take action: "[T]hese guys have to be suspended, this can't happen. You don't come into another company. . . . This is my company, it happened to my firehouse, this was my property. I take care of this." (Tr. 42-43; see also Tr. 221-22 (Ann Logan testified that she "[didn't] think it mattered whose picture was up there, it shouldn't have been done").) In other words, it was pursuant to his official duties as captain of Company #1 that he sought to have these individuals disciplined. (See Tr. 83 ("The fire officers and that includes lieutenants, captains and chiefs . . . oversee discipline.").) Courts have consistently held that speech made through internal procedures for filing grievances and disciplining employees is "pursuant to" a public employee's job duties.[12] See also Garcetti, 547 U.S. at 420 ("Underlying [the Supreme Court's employee-speech jurisprudence] has been the premise that while the First Amendment invests public employees

_____

[12] See, e.g., Weintraub v. Bd. of Educ. of City Sch. Dist. of N.Y.C., 593 F.3d 196, 201 (2d Cir. 2010) (holding that plaintiff-schoolteacher, "by filing a grievance with his union to complain about his supervisor's failure to discipline a child in his classroom, was speaking pursuant to his official duties and thus not as a citizen"); Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (same for a prison guard's internal complaints documenting her superior's failure to respond to inmates' sexually explicit behavior towards her); Battle v. Bd. of Regents, 468 F.3d 755, 761 (11th Cir. 2006) (same for university employee's report to the president and vice president of the university alleging improprieties in her supervisor's handling and management of federal financial aid funds).

with certain rights, it does not allow them to 'constitutionalize the employee grievance.'" (quoting Connick v. Myers, 461 U.S. 138, 154, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983))). Further, Monz never communicated with the public about the campaign poster incident or the Department's decision not to discipline the firefighters involved.

In contrast, his speech related to the alcohol policy was outside the scope of his duties as an officer. While as captain of Company #1 Monz had a duty to ensure that the members of his company were not responding to calls while intoxicated, Monz's speech went beyond supervising his company during fire and rescue scenes and disciplining members for unsafe and inappropriate conduct. He "didn't like the way things were being done" in the Department as a whole, and he "actually got loud about it." (Tr. 39.) It was not a "mere private employee grievance," Cioffi, 444 F.3d at 165; the ultimate decision to modify the drinking policy was made by the Commissioners--i.e., elected public officials--during a meeting that was open to the public.

Thus, the Court finds that Monz's speech related to the campaign poster issue was "pursuant to" his official duties as captain of Company #1, not "as [a] citizen[] for First Amendment purposes." Garcetti, 547 U.S. at 421. Therefore, any retaliatory action taken against him for fighting to have those

individuals disciplined is not actionable as a violation of the First Amendment.

### 2. Causation

The only issue submitted to the jury was whether Plaintiff established the requisite causal connection. The jury was instructed that, to establish causation, Plaintiff must show that the protected speech "was a substantial and motivating factor in the [D]efendants' decision to take adverse action against him." (Tr. 271.) See Cioffi, 444 F.3d at 167-68; Washington v. Cnty. of Rockland, 373 F.3d 310, 320 (2d Cir. 2004). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Mandell v. Cnty. of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003) (internal quotation marks and citation omitted).

Plaintiff argues that the jury's verdict is supported by the following evidence: (1) direct evidence of "hostility and a retaliatory animus" by Lattman and Strong (Pl. Opp. ¶ 30); (2) the "temporal proximity between the poster incident and Mr. Lattman and Mr. Strong's retaliatory treatment" (Pl. Opp. ¶ 29); and (3) "[t]he fact that no-else [sic] had ever been denied re-admission, and that Mr. Monz was treated differently than numerous other firefighters (including Charles Freedman, who was

granted readmission the same day as Mr. Monz's application was denied)" (Pl. Opp. ¶ 27). The Court will address the sufficiency of each in turn.

### a. Direct Evidence of Retaliatory Animus

Plaintiff provides two examples of what he considers direct evidence of retaliatory animus: (1) "his own direct observations of Mr. Lattman and Mr. Strong not speaking to him and not acknowledging his presence" (Pl. Opp. ¶ 30) and (2) Lattman's testimony that he voted against reinstatement because he "heard that Mr. Monz was very upset with certain members of the department, [himself] being one, Hank Strong, board of fire commissioners, [and] a couple of company one members," and that he thought that "it was not going to be good for morale to allow Mr. Monz to come back because of what [he] was hearing," (Tr. 138; see also Pl. Opp. ¶ 30). Defendants argue that this is not evidence of unlawful animus. (Def. Reply 6.) The Court agrees.

First, dislike is not an illegal motive. See McCook v. Spriner Sch. Dist., 44 F. App'x 896, 908-09 (10th Cir. 2002); see also Miller v. N. Belle Vernon Borough, No. 08-CV-1435, 2010 WL 4388069, at *5 n.7 (W.D. Pa. Oct. 29, 2010) ("[T]he First Amendment does not forbid retaliation based, for example, in 'generic dislike.'"); Heffernan v. Straub, 612 F. Supp. 2d 313, 328 (S.D.N.Y. 2009) (holding that disagreement or hostility alone is insufficient to support an inference of retaliatory

animus), rev'd on other grounds, 655 F. Supp. 2d 378 (S.D.N.Y. 2009). Thus, evidence that Plaintiff's relationship with Lattman may have been "hostile," on its own, is insufficient to establish causation.

Second, Plaintiff seems to be arguing that Lattman and Strong's silent treatment following the campaign poster incident in 2002 is "direct" evidence that the Moving Defendants voted against reinstatement in 2005 because he spoke out against the Department's hard-drinking frat boy image. (Pl. Opp. ¶ 30.) However, Monz testified that prior to the campaign poster incident "all that drinking thing calmed down and everything." (Tr. 40; see also Tr. 42.) Thus, this evidence is circumstantial and speculative, at best, and insufficient to establish causation. See Rakovich v. Wade, 850 F.2d 1180, 1191 (7th Cir. 1988) ("More than mere speculation must serve as the basis for finding that [such speech] is the 'motivating cause.' If this link is not made a reasonable jury could not find that the [speech] 'motivated' the defendant; thus, the defendant should prevail on the motion."), overruled on other grounds by Spiegla v. Hull, 371 F.3d 928 (7th Cir. 2004).

Third, Lattman's statement that he voted against reinstatement "most[ly]" because of "what [he] was hearing around the [D]epartment" about Monz "coming back with vendetta against Bill Lattman and Hank Strong" (Tr. 179) is similarly

20

insufficient to establish causation. Plaintiff fails to link this statement to his constitutionally protected speech. If anything, this may establish a causal connection between Lattman's vote against reinstatement and Monz's attempt to get members of Company #2 suspended for the campaign poster incident. But, as the Court previously stated, Monz's fighting to have those firefighters disciplined is not constitutionally protected speech, and the District's retaliating against him for such speech is not actionable. See supra Part I.B.1.

Finally, even if there was direct evidence of Lattman and Strong's retaliatory animus, which there is not, such evidence alone cannot be used to hold Gallino and Brewer individually liable.[13]

---

[13] The Court notes that there is some authority to suggest that a final decisionmaker--here, the District--may be held liable for rubberstamping a recommendation made by a subordinate with an improper motive. See Staub v. Proctor Hosp., __ U.S. __, 131 S. Ct. 1186, 1194, 179 L. Ed. 2d 144 (2011) (holding in cases under the Uniformed Services Employment and Reemployment Rights Act that a decisionmaker's exercise of judgment is not always a superseding cause of an adverse employment action if a subordinate acts with illegal animus intending to cause the adverse action and the subordinate's acts were a proximate cause of the adverse action). However, the Second Circuit has yet to determine whether this approach--the so-called "cat's paw" theory of liability--is applicable in the context of § 1983 actions, see Nagle v. Marron, 663 F.3d 100, 118 (2d Cir. 2011), and the Court will not do so here. Plaintiff did not explicitly argue this theory of liability, it was not included in the jury instructions, and, most importantly, no facts were introduced to establish that even Lattman or Strong had an impermissible motive.

b.  <u>Temporal Proximity</u>

Plaintiff can also "establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." <u>Espinal v. Goord</u>, 558 F.3d 119, 129 (2d Cir. 2009) (citing <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," <u>Gorman-Bakos v. Cornell Coop. Extension</u>, 252 F.3d 545, 554 (2d Cir. 2001), and a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of [each] particular case[]," <u>Espinal</u>, 558 F.3d at 129.

Here, Plaintiff argues that "[t]he causal connection between Plaintiff's and Defendants' retaliation is further demonstrated through temporal proximity between the poster incident and Mr. Lattman and Mr. Strong's retaliatory treatment." (Pl. Opp. ¶ 29.) Plaintiff explains:

> Mr. Lattman and Mr. Strong began being hostile towards Plaintiff immediately upon Plaintiff's complaint regarding defacement of the campaign posters. For no reason other than in retaliation for Plaintiff's complaint, Mr. Strong and Mr. Lattman refused to speak with Plaintiff or acknowledge his presence, and then Mr. Strong made the process of seeking leave of absence for his family's medical needs extremely difficult. This retaliation then

> continued when Plaintiff sought
> reinstatement, with Mr. Strong injecting
> himself into the process for no apparent
> reason.

(Pl. Opp. ¶ 29.) Plaintiff is wrong for two reasons.

First, Plaintiff is mischaracterizing the issue. The temporal proximity must be between Monz's exercise of his First Amendment right and the adverse employment action. See Espinal, 558 F.3d at 129 ("protected activity" closely followed by "adverse action" may be indirect evidence of causation). Here, the protected activity is Monz's speaking out against the alcohol policy and the hard-drinking frat boy culture, not, as Plaintiff suggests, Monz's involvement in the campaign poster incident. See supra Part I.B.1. And the adverse employment action is the denial of his reinstatement, not Lattman and Strong's "hostility" (see Mem. & Order, Docket Entry 62, at 8). See also supra pages 19-20.

Second, the temporal proximity between Monz's protected speech and the adverse employment action is too remote and attenuated to establish a causal connection. The protected speech occurred in 2001, and reinstatement was denied in February 2005. Courts have held that significantly shorter periods are too attenuated. See, e.g., Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the

plaintiff's EEOC complaint, was in response to the plaintiff's protected activity); Markovic v. N.Y.C. Sch. Constr. Auth., No. 99-CV-10339, 2002 WL 22043, at *8 (S.D.N.Y. Jan. 8, 2002) (finding an eight-month lapse between protected speech and plaintiff's termination insufficient to suggest a causal connection); Morris, 196 F.3d at 113 (stating that "no inference of causation [was] justified," when two years elapsed between the protected speech and the adverse employment action). Monz even admits that any animus that resulted from his speaking out about the alcohol policy was "forgotten about" before the 2002 election (Tr. 42), further evincing that no inference of discrimination can be supported by the record.

c. Disparate Treatment

Finally, Plaintiff argues that "[t]he fact that no-else [sic] had ever been denied re-admission . . . strongly suggests a retaliatory motive." (Pl. Opp. ¶ 27.) While evidence of differential treatment can support a claim of First Amendment retaliation, see Gronowski v. Spencer, 424 F.3d 285, 295 (2d Cir. 2005), such differential treatment alone is insufficient. Plaintiff must still "establish a nexus between [P]laintiff's protected speech and the [adverse employment action]." Washington, 373 F.3d at 321 (emphasis in original). Plaintiff has failed to do that here.

There are three potential comparators: Charles Freeman, Dolaina Thomsen, and Dennis Susskraut. Assuming _arguendo_ that these individuals and Monz are similarly situated,[14] there is no evidence establishing that the differential treatment related to Monz's protected speech. In fact, there is evidence to the contrary--namely Plaintiff's testimony that before his resignation "the drinking thing's forgotten about." (Tr. 42.) He stated that he, Lattman, and Strong were "all pals, hanging out," and that "Chief Bill and Hank invited me to chiefs [sic] council meetings, to see what it's about being a chief, I loved it." (Tr. 42.) In light of Plaintiff's own testimony, any inference that can be drawn from the differential treatment is mere speculation and insufficient to support the jury's verdict.

## II.  Defendants' Rule 59 Motions

As the Court granted Defendants' motion for judgment as a matter of law, Defendants' motions for a new trial, for remittitur, or for a new trial as to damages are DENIED AS MOOT.

---

[14] The Court questions whether they were in fact similarly situated.  Charles Freeman was reinstated despite resigning in bad standing because he had been granted honorary status, and Dolaina Thomsen and Dennis Susskraut were reinstated despite resigning in bad standing with 17.55 out of 20 percent and 11.54 out of 15 percent participation respectively--significantly higher than Monz's 1.9 out of 15 percent participation. However, on a Rule 50 motion, the Court must draw all reasonable inferences in favor of the nonmoving party.  See Cross, 417 F.3d at 247-48.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for judgment as a matter of law is GRANTED, and Defendants' motions for a new trial, for remittitur, or for a new trial as to damages are DENIED AS MOOT. The Clerk of the Court is directed to enter judgment in favor of Defendants and to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    February __15__, 2012
             Central Islip, NY